Michael C. Wenzel, State Bar No. 215388
Ilana Kohn, State Bar No. 203389
Kara Goidosik, State Bar No. 337705
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
The Waterfront Building
2749 Hyde Street
San Francisco, California 94109
Telephone: (415) 353-0999
Facsimile:  (415) 353-0990
Email:     mwenzel@bfesf.com
           ikohn@bfesf.com
           kgoidosik@bfesf.com

Attorneys for Defendants
BRENDON D. WOODS, DIANE BELLAS, LAW OFFICES
OF THE ALAMEDA COUNTY PUBLIC DEFENDER,
COUNTY OF ALAMEDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRANCE BUTLER,<br><br>        Plaintiff,<br><br>v.<br><br>BRENDON D. WOODS; DIANE BELLAS;<br>LAW OFFICES OF THE ALAMEDA<br>COUNTY PUBLIC DEFENDER; COUNTY<br>OF ALAMEDA; and DOES 1 through 10,<br>inclusive,<br><br>        Defendants. | Case No. 3:21-cv-00867-VC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, MOTION FOR PARTIAL SUMMARY JUGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>Date:   September 29, 2022<br>Time:   9:30 a.m.<br>Place:  Courtroom 1, 17th floor |

# **TABLE OF CONTENTS**

NOTICE ..................................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I.  INTRODUCTION .........................................................................................................1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................3

    A.  The Sexually Violent Predators Act ..................................................................3

    B.  The Alameda County Public Defender's Office ................................................4

        1.  Supervision & Training.........................................................................6

        2.  SVP Attorneys Determined Legal Strategies Based on their Professional
Judgment, Not Based on a County Policy or Administrative Directive .................7

    C.  Plaintiff's Civil Detention and Representation by the ACPD .............................8

        1.  Clif Taylor: 2007 to 2009 .....................................................................8

        2.  Mike McCormick: 2008 to 2011...........................................................9

        3.  George Higgins: 2011 to 2014.............................................................11

        4.  Adrienne Elenteny: 2015 to 2016 .......................................................13

        5.  David Klaus: 2016 to 2018 .................................................................13

    D.  Defendants Had No Opportunity to Fully and Fairly Litigate the Instant Claims............14

III.  LEGAL ARGUMENT ...............................................................................................15

    A.  Plaintiff's First Claim For Deliberate Indifference Against Woods and Bellas Is
Meritless.............................................................................................................15

    B.  The Claims Against Bellas and Woods Are Barred By the Doctrine of Qualified
Immunity.............................................................................................................17

    C.  Plaintiff Cannot Establish *Monell* Liability Under Any Theory........................19

        1.  No Evidence Supports A Claim Based On A Pattern, Policy Or Custom .................20

        2.  Plaintiffs Have No Evidence to Support a Ratification Claim ..................21

        3.  Plaintiffs' Inadequate Training Claim Is Meritless ................................21

    D.  Offensive Collateral Estoppel Does Not Apply to the Habeas Petition............23

    E.  Plaintiff's Claims Are Untimely And Barred By The Statute Of Limitations.................25

IV.  CONCLUSION............................................................................................................26

i

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUGMENT
*Butler v. Woods, et al.*, U.S.D.C. Northern District of California Case No. 3:21-cv-00867-VC

# TABLE OF AUTHORITIES

**Cases**

*Appling v. State Farm*
   340 F.3d 768 (9th Cir. 2003) ............................................................................26

*Bd. of the Cnty. Comm'rs. of Bryan Cnty. v. Brown*
   520 U.S. 397 (1996)...............................................................................21, 22

*Belanus v. Clark*
   796 F.3d 1021 (9th Cir. 2015) ...........................................................................28

*Birch v. Gonzalez*
   2013 WL 1191429 ..............................................................................................27

*Brosseau v. Haugen*
   543 U.S. 194 (2004) ...........................................................................................19

*Castro v. Cnty. of L.A.*
   833 F.3d 1060 (9th Cir. 2016) ...........................................................................22

*Christie v. Iopa*
   176 F.3d 1231 (9th Cir. 1999) ...........................................................................23

*City of Canton, Ohio v. Harris*
   489 U.S. 378 (1989)...............................................................................17, 22, 23

*Connick v. Thompson*
   563 U.S. 51 (2011)...............................................................21, 23, 24, 25

*D.C. v. Wesby*
   138 S. Ct. 577 (2018)..........................................................................................19

*Davis v. Ellensburg*
   869 F.2d 1230 (9th Cir. 1989) ...........................................................................21

*Dougherty v. City of Covina*
   654 F.3d 892 (9th Cir. 2011) .............................................................................23

*Dubner v. City & Cnty. of San Francisco*
   266 F.3d 959 (9th Cir.2001) ..............................................................................18

*Flores v. Cnty. of Los Angeles*
   758 F.3d 1154 (9th Cir. 2014) ...........................................................................18

*Gillette v. Delmore*
   979 F.2d 1342 (9th Cir. 1992) ...........................................................................23

*Gordon v. Cty. of Orange*
   6 F.4th 961 (9th Cir. 2021) ................................................................................19

*Hays v. Clark County Nevada*
   2008 WL 2372295, *11 (D. Nev. 2008) ...........................................................27

*Henderson v. City & Cnty. of San Francisco*
   No. C-05-234 VRW, 2006 WL 3507944 *1 (N.D. Cal. Dec. 1, 2006) ..............22

ii

*Hillblom v. Cnty. of Fresno*
539 F.Supp.2d 1192 (E.D. Cal. 2008)...................................................................................16

*Hunter v. Bryant*
502 U.S. 224 (1991)...................................................................................................................19

*In re Citric Acid Antitrust Litig.*
1996 WL 116827, at *1 (N.D. Cal. 1996) ...........................................................................26

*In re Ronje*
179 Cal.App.4th 509 (2009) ....................................................................................................10

*Jeffers v. Gomez*
267 F.3d 895 (9th Cir. 2001) ...................................................................................................17

*Johnson v. City of Vallejo*
99 F.Supp.3d 1212 (E.D. Cal. 2015)................................................................................16, 17

*Jones v. Blanas*
393 F.3d 918 (9th Cir. 2004) ...................................................................................................28

*Jones v. Williams*
297 F.3d 930 (9th Cir. 2002) ...................................................................................................16

*Leer v. Murphy*
844 F.2d 628 (9th Cir. 1988) ...................................................................................................16

*Maldonado v. Harris*
370 F.3d 945 (9th Cir. 2004) ...................................................................................................28

*Marietta v. LoBue*
851 F. App'x 108 (9th Cir. 2021) ............................................................................................18

*Mattos v. Agarano*
661 F.3d 440 (2011)...................................................................................................................19

*Meehan v. Los Angeles Cnty.*
856 F.2d 102 (9th Cir. 1988) ...................................................................................................21

*Parklane Hosiery Co. v. Shore*
439 U.S. 322 (1979)...........................................................................................................25, 26

*Pearson v. Callahan*
555 U.S. 223 (2009)...................................................................................................................18

*Pembaur v. City of Cincinnati*
475 U.S. 469 (1986)...................................................................................................................22

*People v. Landau*
214 Cal.App.4th 1 (2013) .........................................................................................................20

*People v. Sanchez*
63 Cal. 4th 665(2016) ..................................................................................................................3

*People v. Superior Ct. (Vasquez)*
27 Cal. App. 5th 36 (2018) ................................................................................................14, 20

iii

*People v. Yates*
  25 Cal. App. 5th 474 (2018) ..................................................................................3

*Plumeau v. Sch. Dist. #40 Cnty. of Yamhill*
  130 F.3d 432 (9th Cir. 1997) ...............................................................................21

*Preschooler II v. Clark County Sch. Bd. Of Trs.*
  479 F.3d 1175 (9th Cir. 2007) .............................................................................17

*Reichle v. Howards*
  566 U.S. 658 (2012) .............................................................................................19

*Reilly v. Superior Court*
  57 Cal.4th 641 (2013) ..........................................................................................12

*Saucier v. Katz*
  533 U.S. 194 (2001) .............................................................................................19

*St. Louis v. Praprotnik*
  485 U.S. 112 (1988) .............................................................................................23

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) .............................................................................17

*Syverson v. Int'l Bus. Machines*
  472 F.3d 1072 (9th Cir. 2007) .............................................................................26

*Taylor v. List*
  880 F.2d 1040 (9th Cir. 1989) .......................................................................16, 17

*Tuuamalemalo v. Greene*
  946 F.3d 471 (9th Cir. 2019) ...............................................................................19

*Wallace v. Kato*
  549 U.S. 384 (2007) .............................................................................................28

*Weiner v. San Diego County*
  210 F.3d 1025 (2000) ...........................................................................................27

*White v. Roper*
  901 F.2d 1501 (9th Cir. 1990) .............................................................................16

*Wiley v. Pliler*
  WL 2344888 (E.D.Cal 2007) ..............................................................................27

*Wilson v. Layne*
  526 U.S. 603 (1999) .............................................................................................20

**Statutes**

California Code of Civil Procedure § 335.1 ........................................................25

California Government Code §12550 ..................................................................15

California Government Code §25303 .............................................................15, 24

California Government Code §26500 ................................................................................................ 15, 24

Welfare & Institutions Code §6600 *et seq.* ............................................................................................ 3

**NOTICE**

TO PLAINTIFF AND HIS ATTORNEYS-OF-RECORD: PLEASE TAKE NOTICE that on September 29, 2022, at 9:30 a.m., Defendants COUNTY OF ALAMEDA, a municipal entity, BRENDON WOODS and DIANE BELLAS will and hereby do move this Court for an order granting summary judgment or, alternatively, partial summary judgment. This motion is brought pursuant to FRCP, Rule 56, on the grounds that the uncontroverted evidence establishes: (1) Neither Diane Bellas nor Brendon Woods were deliberately indifferent to Plaintiff's constitutional rights; (2) Bellas and Woods are entitled to qualified immunity; and (3) The *Monell* liability claim is unsupported by any evidence. Defendants also oppose Plaintiff's Motion for Partial Summary judgment on the ground that offensive collateral estoppel does not apply and Defendants are not barred from litigating the constitutional violations Plaintiff alleges in this case.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Plaintiff Terrance Butler ("Butler" or Plaintiff) brings this action against defendants County of Alameda ("County"), the Office of the Public Defender ("ACPD"), Chief Public Defender Brendon Woods ("Woods") and former Chief Public Defender Diane Bellas ("Bellas") (collectively "Defendants") arising out of his detention at Coalinga State Hospital where he was detained as a Sexually Violent Predator under the Sexually Violent Predator's Act ("SVPA"). Because both the District Attorney and the judiciary have immunity from Section 1983 claims such as his, Plaintiff takes aim at the Alameda County Public Defender's Office, notwithstanding that it was Plaintiff's public defenders who ensured he did not serve a lifetime commitment at Coalinga State Hospital. But for the skill and professional judgment of his public defenders, Plaintiff would not be free today. His claims against Defendants are meritless.

The SVPA, by its terms, limits SVP detainees like Plaintiff to only one chance to prevail at trial. The severe consequence of losing at trial is indefinite commitment with limited opportunity for reconsideration and near impossibility of reversing the decision once adjudicated as an SVP. SVP proceedings are civil matters not subject to Sixth Amendment speedy trial requirements, SVP law is constantly evolving, and it was not clear that detainees had anything more than a right to trial in an

1

undefined "reasonable" time with no specified time constraints. The undisputed evidence in this case establishes that Plaintiff was represented by extremely experienced public defenders, with decades of experience in complex criminal defense matters, and that the actions they took in Plaintiff's case were the result of carefully considered strategic defense tactics, designed to maximize Plaintiff's chances of demonstrating that he was rehabilitated and minimize the likelihood he would be adjudicated an SVP and ordered to indefinite confinement. Plaintiff's public defenders had demonstrated exceptional skill as senior attorneys, with established, exemplary professional records, and their high level of experience, the nature of legal work and client representation warranted and necessitated that these attorneys manage their case strategies autonomously, without the need for micromanagement. Neither cases within the SVP Unit nor the individual attorneys assigned to the SVP Unit ever demonstrated a need for micromanagement by a Chief Public Defender, and Plaintiff has no evidence to suggest that Bellas or Woods were deliberately indifferent to the need to micromanage the SVP attorneys' handling of any SVP client matter, including Plaintiff's defense. Plaintiff's §1983 deliberate indifference/supervisory liability claim against Bellas and Woods is meritless. Plaintiff also cannot meet his burden to identify any factually similar case authority that clearly prohibited Bellas or Woods from allowing their highly trained and experienced senior attorneys from autonomously handling their SVP client cases and exercising their professional judgment to implement defense strategies, and Bellas and Woods, therefore, are entitled to qualified immunity. The uncontroverted evidence also fails to show that Plaintiff's rights were violated by any County policy, pattern or practice, inadequate training or municipal ratification, and his *Monell* claims against the County are baseless. Defendants, therefore, are entitled summary judgment in their favor.

Further, the undisputed evidence plainly shows that Plaintiff's reliance on offensive collateral estoppel is unsupportable and improper in this case. Plaintiff's habeas corpus proceeding did not involve the same parties or issues, and Defendants had no opportunity to litigate the facts of this case or the issues against them. Application of offensive collateral estoppel in this case is manifestly unfair to Defendants. Plaintiff's motion for partial summary judgment should therefore be denied.

//

//

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     The Sexually Violent Predator Act

The SVPA authorizes the state to civilly commit persons found to be sexually violent predators after completing their prison terms (Wel. & Inst. Code §6600 *et seq.*).[1] The statutory definition of a "sexually violent predator" requires that the individual (1) have been convicted of a qualifying sexually violent offense, and (2) have a diagnosed mental disorder that makes it likely that the individual will engage in sexually violent criminal behavior if released into the community. (§6600(a)(1).) If two practicing psychiatrists or psychologists from Department of State Hospitals ("DSH") agree that the individual meets SVP criteria, the DSH forwards a request for a petition for commitment to be filed by the District Attorney. (§6601.) After a petition for commitment is filed, the court holds a probable cause hearing to determine if the individual meets SVP criteria. (§6602.) Upon a finding of probable cause, the individual is involuntarily detained until a full trial can be held. (§§6601.5, 6602.)

Prior to the SVPA's amendment in 2006, when an individual was found to meet SVP criteria at trial, the period of subsequent civil commitment expired after two years and a new petition would have to be filed, thus providing for a trial every two years. (§§6604, 6604.1 (2002); Clif Taylor Deposition "CT" 92:15-93:6.) In 2006, the SVPA was amended to lengthen the term of an SVP commitment from two years to an indeterminate term. (§§6604, 6604.1; CT 80:2-24.) As amended, the SVPA now allows for only one trial. (George Higgins Depo. "GH" 148:4-11.) Therefore, if a jury finds the detainee is a sexually violent predator, the result is indefinite commitment with limited opportunity for the SVP to petition the court for reconsideration. (§§6604, 6604.1 (2008); CT 81:14-83:8; Reporter's Transcript, August 21, 2019 ("RT 8/21/2019") 10:7-11:19, Pltff. Ex. 2.) During trial in an SVP case, the jury hears evidence of the detainee's entire life history, all the facts of the underlying qualifying offense(s), and any other violent offenses or problematic conduct at the hospital.  (CT 98:7-14, David Klaus Declaration ("Klaus Dec.") ¶5.)[2] Once a jury hears such inflammatory facts, the likelihood of prevailing at an SVP trial is extremely low. The 2006 amendment drastically changed the consequences of going to trial and

---

[1] All subsequent citations are to the Welfare & Institutions Code unless otherwise specified.

[2] Prior to 2016, an expert witness testifying in an SVP case was permitted to relate case-specific hearsay to the jury. (See *People v. Yates*, 25 Cal. App. 5th 474, 482 (2018); *People v. Sanchez,* 63 Cal. 4th 665, 686 (2016).)

made it much more difficult to secure one's freedom after losing at trial. (RT 8/21/2019, 46:18-47:2; CT 100:21-101:20.)

The SVPA does not specify a timeframe in which a detainee must be brought to trial. (RT 8/21/2019, 33:10-22; CT 180:2-181:9; David Klaus Depo. "DK" 89:18-25.) After the 2006 amendment, attorneys and SVP detainees understood they had far more to lose by going to trial if it did not seem likely that they would prevail. Many SVP detainees have made a conscious decision to delay trial to continue treatment as a means of improving their chances before a jury. (Klaus Dec., ¶7.) When the prospects for prevailing at trial are very low, the reasons for long-term delay of an SVP trial are apparent to any defense attorney experienced in SVP litigation. An SVP's participation in treatment can cause an SVP evaluator who previously opined the alleged SVP meets the criteria to "flip" in a subsequent updated evaluation. (Michael McCormick Depo. ("MM") 64:17-66:22; CT 98:7-99:16; GH 78:20-79:1.) In some cases, the defense strategy may be to defer treatment until the SVP detainee has exhausted attempts to be released from the hospital through legal motions. (MM 69:19-71:18, 72:25-74:2, 76:2-14.) Participation in treatment also helps the SVP's chances at trial. (MM 71:19-72:15.) In addition, an SVP's advancing age causes their score on the "Static 99" (actuarial tool used to predict likelihood of re-offense) to decrease. Finally, the passage of time between the SVP trial and the qualifying offenses will also improve the chances of prevailing at trial. (CT 97:19-99:16, 157:10-13; DK 185:24-186:1.) Where the attorney and client agree the client has a bad defense case for trial, a common defense strategy is to pursue dismissal of the SVP petition through law and motion work ("collateral legal attacks") while delaying trial. (DK 147:12-149:3, 169:1-20, 187:18-188:6; GH 53:16-54:11.) Such motions were filed by the attorneys who handled Plaintiff's SVP case, including the *Vasquez* motion that ultimately led to his release. (Youseef Elias Depo. "YE" 85:16-22.)

**B.    The Alameda County Public Defender's Office**

The Chief Public Defender for the County is the administrative head of the ACPD's Office and does not have direct operational supervision of all attorneys, but rather, delegates operational supervision to attorneys who have achieved significant experience levels and stature enabling them to evaluate the work of those they are responsible for monitoring. (Diane Bellas Depo. "DB" 93:16-94:14; MM 99:15-100:23, 102:11-103:9; Brendon Woods Depo. "BW" 84:7-85:11, 188:12-189:7.) Diane Bellas was the

Chief Public Defender for the County from 2000 to 2012. (DB 9:9-15.) Brendon Woods succeeded Bellas in 2012 and is the current Chief Public Defender. (BW 12:24-13:18, 48:10-15, 62:2-8.)

Woods has worked in the PD's Office since 1996 and has held various positions that included trial work and leadership roles, advancing throughout the years to his current position as Chief. (BW 14:3-8, 15:9-19, 17:17-18:22, 19:19-20:11, 23:18-24:6, 28:23-30:4, 49:25-50:7.) Woods' prior position as Senior Assistant Public Defender to Bellas included responsibility for providing mentor guidance, assigning cases, determining conflicts, running the trial staff, managerial tasks, directing recruitment, and training post-bar clerks and new attorneys. (BW 33:17-35:7.) Woods received training from the ACPD's Office related to the SVP Act and its possible consequences after he became an associate deputy public defender in 1998. (BW 21:1-23.)

The ACPD's SVP unit was routinely staffed by two extremely experienced, long-time public defenders in rotating assignment. Attorneys are required to have a significant number of years practicing as criminal defense attorneys to even be considered for the SVP unit. (YE 55:2-12, 76:6-10, 122:10-123:5; DB 17:14-23, 18:21-19:6, 24:25-25:7; CT 60:25-61:10; 69:7-71:21; MM. 147:22-148:22, BW 35:12-36:8.) SVP attorneys are some of the most senior, intelligent, scholarly, independent, experienced attorneys in the ACPD's Office, and included accomplished authors of legal treatises, former heads of other ACPD units and attorneys with statewide training. Based on their experience, record and reputation in the office, the senior attorneys assigned to the SVP unit were known to put their clients' legal interests first and they did not require direct supervision or micro-management. (BW 81:2-82:10, 188:12-189:7; DB 37:6-14, 38:2-19, 39:19-40:2, 46:16-47:6, 61:2-20, 62:7-20, 94:3-95:24.)

Although the attorneys work collaboratively, each SVP attorney is individually responsible for their cases, and like all trial lawyers, SVP attorneys made strategic decisions about the cases they were handling. (YE 97:5-21; BW 86:8-22; DB 66:18-67:13.) Bellas and Woods expected attorneys to prioritize their client's interests and represent their clients to the best of their abilities and they believed the experienced SVP attorneys were acting accordingly. (BW 188:12-25; DB 83:4-84:8, 89:11-24.) Both Bellas and Woods were personally familiar with the qualifications of the SVP Unit attorneys because they had worked together for years. (BW 99:4-8; DB 39:19-25, 46:2-47:6, 100:24-101:8.)

### 1. Supervision and Training

There was no specific mandate as to particular training upon assignment to the SVP unit, as SVP attorneys had undergone many years of training and experience and handled numerous cases and they understood the training options available. (YE 123:6-124:20.) Their many years of practicing as ACPD criminal defense attorneys necessarily included extensive training, and their experience ensured that they knew what training and research needed to be done to get up to speed on various issues, including SVP matters, just as in any type of case. (YE 122:10-123:22, 136:21-137:8; DB 46:16-47:6; BW 106:12-23; DK 107:19-109:20.) Copies of materials guiding the duties of attorneys defending SVP cases published by organizations such as the California Public Defender's Association and other entities were maintained in the SVP unit and shared amongst the unit attorneys. (DB 46:2-15.) Written reading materials that were provided to attorneys when they joined the SVP unit detailed every aspect of SVP cases, including, but not limited to, experts, cross-examining doctors, state hospital operations and programs, memos on SVP law and issues, and memos that were prepared by attorneys statewide. (CT 79:8-80:8, 88:6-20, 89:4-19, 90:1-91:9; MM 58:8-59:14, 63:19-64:11.)

Attorneys rotating into the SVP unit received training that included meeting with current SVP attorneys to discuss the individual cases and the SVP process, reviewing case files, attending SVP court appearances, and often shadowing outgoing attorneys. (CT 76:10-77:16; AE 49:22-51:2; GH 140:1-141:12, 144:2-8; DK 65:7-66:6; MM 55:7-23, 63:19-25.) Attorneys were trained to advise clients of potential SVP consequences so they could make informed decisions before resolving their cases or going to trial. (YE 74:19-23; BW 21:24-23:7, 35:16-36:5.) The SVP unit held regular monthly in-house training that included exchange of information about SVP law, issues and developments, and the ACPD Office held annual training sessions on changes in the law, including SVP related changes, and weekly case law updates. (CT 78:10-20, 90:23-91:9; BW 115:22-116:18.) SVP attorneys also attended public defender training seminars and conventions that included issues related to handling SVP cases. (CT 77:17-78:9, 109:22-110:9; GH 75:11-76:23, 141:13-22; DK 66:17-67:23; AE 48:12-49:5.) The attorneys also communicated and exchanged knowledge, engaged in self-study and compiled substantial knowledge to be maintained for future SVP attorneys. (CT 79:8-80:1, 88:6-25, 90:7-91:9; DB 44:2-18, 45:3-12, 46:2-47:6; AE 52:7-55:6; MM 59:2-14.)

Cases in the SVP unit were generally divided evenly between the attorneys for an equitable caseload. (CT 74:9-13, 125:16-126:5; MM 60:6-20.) Bellas, through her designees, kept meticulous records regarding attorney caseloads reflecting distribution and workload management. (DB 97:12-98:21.) Woods also reviews an annual report of all the ACPD cases, which includes SVP cases and tracks the number of SVP cases, the number of cases closed and all conflicts. (BW 135:20-138:4.) Neither Bellas nor Woods were ever advised by anyone that any SVP attorney's caseload was too heavy or that they were not providing more than competent representation because of their workloads. (BW 151:20-153:19, 191:12-192:1; DB 50:1-51:10, 99:1-21, 100:12-19, 100:20-101:20, 108:1-12, 115:3-15; DK 128:15-24, 166:24-167:19; AE 87:22-88:4, GH 158:10-14.) During Bellas' tenure she had a general sense of the SVP attorneys' caseloads based on her personal observations and interactions with them and frequent communications with the attorneys in the office. (DB 29:17-24, 100:20-103:9.) The feedback about SVP attorneys was positive and there was never any negative information about any SVP attorney from the court, the DA, attorneys in the unit, clients, family members, colleagues, or anyone privy to the SVP attorneys' work. (DB 42:4-20, 61:2-62:6, 62:21-63:18.) Like public defenders' offices nationwide, the ACPD's financial resources are limited, however, Bellas and Woods never received any information from Plaintiff's public defenders suggesting that they were not thoroughly and proficiently engaged in representing their clients. (BW 158:2-22, 188:12-25; DB 25:8-26:1, 26:20-27:24, 42:4-20, 94:23-95:24.)

## 2. SVP Attorneys Determined Legal Strategies Based on their Professional Judgment, Not Based on a County Policy or Administrative Directive

The Chief Public Defenders do not direct attorneys in the SVP unit as to particular defense strategies, but rather, strategic decisions are entrusted to the professional judgment of the very experienced SVP attorneys who are familiar with the particular facts and issues of each case. (YE.82:22-25; BW 163:18-164:7, 173:18-174:2; DB 37:6-14, 38:2-19, 39:13-18, 94:7-14)

The ACPD's Office did not have a policy for bringing cases to trial based on the age of cases. The determination to pursue or delay trial is case specific, as cases are brought to trial when they are ready, based on the professional judgment of the highly experienced attorneys handling the cases, such that the client's best defense could be presented with the highest chance of success for the client. (CT 149:16-24, 153:4-19.) The right to a speedy trial applies in criminal cases and such time limits are specifically set by statute. No similar right or statutory time constraints exists in civil commitment cases

where the standard is "reasonable time," which has not been clearly defined. (BW 132:4-133:13.)

**C.   Plaintiff's Civil Detention and Representation by the ACPD**

In 1992, Plaintiff was charged with committing 23 offenses, 21 of which were sexual offenses that could potentially meet the SVP criteria under §6600. (Klaus Ex. 11, ACPD2; ACPD180-83, 195.) He was convicted as to three of the five different victims. (*Id.*, ACPD 4-5, 183-84.) Plaintiff was sentenced to prison and prior to his release in 2006, was screened by two evaluators who found he met the criteria of a sexually violent predator. (*Id.*, ACPD 10-15, 192-94.) Plaintiff's prior criminal record included multiple drug charges, resisting arrest, burglary, assault with intent to commit rape, and assault with a deadly weapon. In November 2006, the DA filed a petition for civil commitment, the court found probable cause, and Plaintiff was sent to Coalinga State Hospital ("CSH").

From 2006 through 2019, Plaintiff was represented by ACPD public defenders Clif Taylor, Mike McCormick, George Higgins, Adrienne Elenteny, and David Klaus. Each of his attorneys were veteran public defenders who had between 20-30 years of experience by the time they were assigned to his case, and who had dedicated their lives to indigent defense. (DK 10:19-11:25, 15:10-17:21, 21:18-23:9). Because SVP cases are difficult to win, only the most experienced lawyers are assigned to the SVP Unit. The attorneys who represented Plaintiff believe the SVPA is unfair and attempted to find the best path to release from what they viewed was an unjust system created by the SVPA. (CT 81:14-82:21; DK 26:19-27:2, 31:22-32:21, 167:22-170:23.)   In 2012, 2018 and 2019, Plaintiff was re-evaluated and each time found by two state psychologists to fit the criteria for a sexually violent predator. (Klaus Exs.12, 13, 14.)

**1.    Clif Taylor: 2007 to 2009**

ACPD Clif Taylor was assigned to the SVP Unit in 2006. Upon his assignment Taylor met with his predecessor to discuss the SVP cases being transferred to him, reviewed written training materials, reviewed SVP law and procedures, and continued to stay abreast of SVP law and defense through ongoing training and seminars. (CT 73:13-21, 74:3-8., 76:10-78:20, 79:8-80:8, 88:6-20, 89:4-19, 90:23-91:9.) Taylor was a very experienced trial attorney who had practiced over 30 years, tried approximately 60 cases and had supervised both the Felony Trial Staff Unit and the Alternate Public Defender's Office for many years before he was assigned to the SVP Unit. Taylor was appointed to represent Plaintiff in December 2006. (CT 19:11-22:25, 28:20-31:20, 55:7-56:2, 61:23-62:4, 72:11-73:21.)

Taylor's primary objective in his representation of Plaintiff (and all SVP clients) was to secure his release, rather than a rushed judgment resulting in indefinite commitment that was nearly impossible to reverse. (CT 93:14-95:4, 97:19-102:17, 180:17-181:3.) Over the course of Taylor's representation, Taylor met with Plaintiff personally and corresponded with him by letter and telephone.  (CT 141:25-143:12, 176:2-17, Taylor Dec., Ex.16.) Taylor believed that the best strategy for Plaintiff was to prepare the best case possible for him at trial, which could take months or years and required Plaintiff to work on establishing a pattern of class attendance and good behavior demonstrating that he no longer qualified as an SVP. (CT 143:13-145:6, 146:14-21, 153:21-155:2, 156:16-157:18.)

Plaintiff asked Taylor to locate witnesses, but directed Taylor not to contact or interview them. (CT 153:21-156:15.) Taylor discussed with Plaintiff his 2006 letter to the judge and explained the best strategy for trial, which included collateral legal attacks to the Petition while Plaintiff participated in treatment. (CT 84:14-86:5, 157:19-159:5.) Taylor filed a demurrer and then appealed the ruling to the Court of Appeal. (CT 84:14-86:5, 162:17-163:7, 163:17-19.) In late 2007, Plaintiff told Taylor he wanted the case set for trial. Although Taylor believed it was not in Plaintiff's best interests to go to trial at that time, he set the case for trial. (CT 156:16-159:5, 160:9-162:16.) At the time the court set the 2008 trial date, there was no "speedy" or "timely" trial right for SVP cases. (CT 180:2-16, 184:19-185:16, 186:3-4.) Taylor retired from the ACPD in December 2007 and the case was transferred to another very experienced public defender, Mike McCormick. (CT 105:14-106:3.)

### 2.    Mike McCormick: 2008 to 2011

Public Defender Mike McCormick began working for the ACPD in 1983, after practicing criminal appellate law for the State Public Defender. (MM 20:17-21:7.) At the time McCormick transferred into the SVP Unit in 2008, he had 25 years of criminal defense experience with the ACPD, including a supervisory assignment at the Fremont Branch. (MM 49:24-50:4, 51:8-14, 103:14-19.) He was already familiar with SVP law and had worked on SVP law and motion matters. (MM 61:21-62:13.) McCormick is an expert in criminal procedure and has been a contributing author to California Criminal Law Procedure and Practice (CEB) (widely known as the "criminal law bible") since its fourth edition. (McCormick Dec. ¶3). McCormick reviewed the SVP training materials when he was assigned to the Unit, spoke with other SVP attorneys about SVP case strategies and shadowed another SVP attorney.

(MM 58:8-60:5, 61:3-20, 63:19-64:11.)

McCormick began representing Plaintiff in 2008. (MM 53:14-16, 94:11-19, 102:2-14.) On March 5, 2008, McCormick informed Plaintiff by phone about the DA's request to postpone the June 2008 trial and then met with Plaintiff in person at CSH. (MM 102:2-103:13, 109:2-8, 113:13-114:8, McCormick Dec. Ex.17, COA535) McCormick began gathering updated records necessary for trial, and kept Plaintiff apprised of his case by telephone and letter. (MM 106:13-19; McCormick Dec. Ex.17.) In Fall 2008, McCormick filed a motion to dismiss the SVP Petition on the ground that the evaluation protocols were invalid. (MM 116:16-117:6.) In November 2008, the court denied the motion and continued the case to December 2008, the next setting conference, to set the case for trial. (MM 117:7-11, 117:21-24, McCormick Dec. Ex. 17, ACPD571) Due to McCormick's trial schedule, the court continued Plaintiff's case to March 2009 to set a jury trial. (*Id.,* ACPD 628.) On March 6, 2009, McCormick requested a jury trial be set, but the court continued the setting date to April 2009, so the DA could consult with the state's evaluators on Plaintiff's case before selecting the trial date. (*Id.,* ACPD 629.)

On March 12, 2009, Plaintiff sent a typed letter to the ACPD requesting a trial "as soon as possible" and that Plaintiff believed his due process rights were being violated. (MM 119:4-120:1.) McCormick requested the court to set a trial date, and the court set a trial for its next available date in January 2010. (MM 120:2-14; 122:9-123:23, ACPD1348.) In June 2009, McCormick consulted with expert Dr. Brian Abbott about Plaintiff's case. (ACPD252.) Dr. Abbott opined that Plaintiff's multiple offenses were so brutal in the manner they were committed, his denial of the offenses was foolish and would backfire against him. (MM 114:9-115:10, ACPD 7662) McCormick discussed this with Plaintiff. (ACPD 7732, Butler Depo., "Butler Dep." Vol. 2, 296:2-6.) In September 2009, the court moved Plaintiff's jury trial, previously set for January 19, 2010, to May 2010, because another case of McCormick's that was previously set for trial was continued to January 19th.  (MM 127:13-128:3, 128:15-22; 125:18-24, 128:4-14, 129:4-13; ACPD 630.) McCormick took steps necessary to prepare for trial and met with Plaintiff again in person at Coalinga. (MM 106:25-107:4; ACPD 630; COA 529-530.)

In November 2009, a Court of Appeal case, *In re Ronje,* held that the protocols used to evaluate SVPs were invalid. (MM 133:8-11; 179 Cal.App.4th 509 (2009).)  The *Ronje* decision was a substantial development in SVP litigation because it granted SVP detainees new evaluations and a new probable

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUGMENT
*Butler v. Woods, et al.,* U.S.D.C. Northern District of California Case No. 3:21-cv-00867-VC

cause hearing, and gave them a mechanism to dismiss the Petition instead of "rolling the dice with a jury." (MM 134:23-135:15.) However, *Ronje* left open the question of whether new evaluations had to be performed by the same evaluators who conducted the original evaluations. (MM 135:24-137:8.) Attorneys practicing SVP defense in California agreed that the best court to decide the issue was the Court that decided *Ronje*, and that the best strategy was to wait on seeking new evaluations until the *Ronje* Court resolved this open question. (MM 135:2-141:19; 133:1-18.) The benefit of having new evaluators was particularly true for Plaintiff, who believed one of his evaluators (MacSpeiden) was biased against him. (Butler Dep., Vol. 1, 78:2-79:4, MM 142:8-21; 145:7-146:4.). In July 2011, McCormick completed his assignment in the SVP Unit and Plaintiff's case was transferred to George Higgins, another very experienced trial attorney. (MM 135:16-23, 147:8-21, 148:23-149:4, 154:10-23.)

### 3.    George Higgins: 2011 to 2014

George Higgins had been a public defender with the ACPD for 24 years before his assignment to the SVP Unit. (GH 105:10-21; 115:24-116:13.) He also was a Navy Judge Advocate and prosecutor in the JAG Corps. (GH 116:6-118:9.) Higgins handled numerous felony jury trials before his SVP rotation, approximately 40-50 felony jury trials to verdict, and over 300 preliminary hearings. (GH 127:19-128:2.) Higgins has taught trial advocacy at Stanford Law School since 1997. (GH 108:6-16.)

In August 2011, Higgins updated Plaintiff on the status of the case, advised him he would be setting the case for a *Ronje* motion, and that he would meet with Plaintiff in person to discuss strategy and how to proceed. (GH 158:19-161:2, Higgins Dec., Ex. 18, ACPD 634). The following month, Higgins met with Plaintiff in person to discuss the case. He updated Plaintiff on the case status and the next court hearing date both in person and by letter. (GH 160:12-166:24; 173:8-21, ACPD 1337; 7793.)

From January through March 2012, Higgins updated Plaintiff by phone and letter about court appearances, the case status, and the status of the *Ronje* motion. (GH 171:13-174:6; ACPD 635-636.) In April 2012, Higgins sent Plaintiff a copy of the *Ronje* motion and informed Plaintiff that new evaluations would be performed in the event the motion was granted. (ACPD 7808.) On May 18, 2012, the court granted the *Ronje* motion, ordered new evaluations and a new probable cause hearing, but denied the motion for <u>new evaluators</u>. (GH 194:14-195:5.) Because the court denied the request for new evaluators, Plaintiff was to be re-evaluated by his original evaluators, Drs. Brook and MacSpeiden. (ACPD 1336.)

Higgins and a social worker intern then traveled to CSH to prepare Plaintiff for the new evaluations with the aim of getting the evaluators to find that Plaintiff no longer met the criteria for an SVP.  (GH 56:10-59:12, 172:24-173:7; 196:25-197:12, ACPD 7767.)

Higgins continued to update Plaintiff on court appearances and the status of his case, and after receiving both updated evaluations, Higgins set the case for the new probable cause hearing. (ACPD 1334, 1335, 7795.) The new probable cause hearing was set by the court for April 5, 2013, at which time Plaintiff had to be present in court. (ACPD 648.)  In early 2013, based on his belief that he was acting in accordance with Plaintiff's wishes, Higgins vacated the probable cause hearing. (GH 64:6-66:3, 89:24-90:22; 163:19-166:24, ACPD 649.) Higgins then made two additional legal challenges: a *Crane* motion and another demurrer. (GH 59:4-12, 61:23-63:2, 174:7-176:7, 207:24-208:9, 212:17-214:8, 220:1-221:16, 244:16-245:7, 219.) The motions filed in Plaintiff's case were akin to appellate motions and took significant time to research and prepare. Higgins also consulted with academics involved in the particular legal issues, and located an expert, Allen Frances, who provided a declaration in support of the *Crane* motion. (GH 174:19-176:7.) The *Crane* motion was denied on July 25, 2014, and Higgins appealed the ruling to the Court of Appeal. (GH 175:13-14, ACPD 638.) The Court denied the petition for writ of mandate on October 1, 2014, and Higgins then analyzed whether there were grounds to appeal the decision to the California Supreme Court. Based on his professional judgment and consultation with other lawyers from his office and Plaintiff, he decided not to appeal the decision. (GH 175:14-19.) Higgins filed the demurrer to be heard on February 20, 2015. (GH 247:14-248:12, ACPD 7715.)

Higgins believed there was no reason to move forward with the post-*Ronje* probable cause hearing because the California Supreme Court had decided *Reilly v. Superior Court*, 57 Cal.4th 641 (2013) which disapproved of the probable cause remedy in *Ronje* absent a showing of material error in the assessment process, an extremely difficult standard to satisfy. (GH 54:12-56:6, 69:20-70:18.) It was Higgins' habit and custom to discuss the suggested strategies, appearances, continuances and court dates with his clients. (GH 71:1-72:3, 163:19-164:6, 212:2-6, 232:25, 245:3-18.) Higgins informed Plaintiff when he was transferring out of the Unit, and during his representation of Plaintiff, Higgins believed he was doing everything in his power to get Plaintiff out of Coalinga. (GH 244:2-5, 250:11-251:9). Higgins' strategies were based on his independent judgment as how to obtain Plaintiff's release from the hospital

and his belief that he was acting in accordance with Plaintiff's wishes. (GH 192:8-193:7.)

### 4. Adrienne Elenteny: 2015 to 2016

In 2015, Alameda Public Defender Adrienne Elenteny was assigned to the SVP Unit. (Adrienne Elenteny Depo. "AE" 30:5-7.) Prior to her assignment, Elenteny had been a public defender for the ACPD for 20 years, had handled felony jury trials, had multiple assignments with the Law & Motion Unit, and had clerked for the California Supreme Court. (AE 14:6-17:7, 19:13-21:22, 23:3-24:7, 26:1-27:7, 30:1-31:13.) Elenteny represented Plaintiff from January 2015 through July 2016, when she retired from the ACPD. (AE 10:20-23) Throughout her representation, Elenteny filed a number of substantive motions to dismiss the SVP Petition, which took significant attorney hours in legal research, motion work, and oral argument. She met with Plaintiff in person and sent updates continuously about the legal challenges and motions being filed in his case. (AE 76:19-82:4, 86:2-87:4; Elenteny Dec., Ex. 19.)

### 5. David Klaus: 2016 to 2018

David Klaus began his employment with the ACPD in 1996 and had been a public defender in the ACPD's office for 20 years before his SVP assignment. (DK 16:2-23:9, 32:25-38:8.) He had been a trial and appellate attorney with the Ohio State Public Defender's Office before that, and, prior to the SVP assignment, had tried 40 jury trials, been on felony trial staff for eleven years, head of felony trial staff for three years, and had been a supervisor for six years. Klaus has taught trial advocacy for the California Public Defender's Association and was the lead attorney in homicide cases involving the death penalty, mass murder, and special circumstances. . (DK 10:19-11:25, 16:14-17:21.) (Klaus Dec., ¶3.)

Because Plaintiff's evaluations consistently found him to meet the criteria of a sexually violent predator, combined with his being written up at Coalinga for stalking behaviors toward female staff, Klaus believed that trial was not a viable path for Plaintiff to be released from Coalinga (DK 78:12-79:20; 148:4-149:3): *"He probably had one of the worst possible cases you could take to an SVP trial."* (DK 148:6-8.) Plaintiff had multiple victims, three qualifying priors, and a narcissistic personality disorder. The evaluators, on different occasions over 12 years, found Plaintiff had a pattern of narcissistic and exploitive behavior. (DK 148:9-17.) Based on Klaus' independent and professional judgment, postponing trial would benefit Plaintiff, so that he could show his behavior at Coalinga had changed, re-enter the Sex Offender Treatment Program and demonstrate he was improving his dynamic risk factors.

(DK 150:7-152:10.) Eventually, Plaintiff and Klaus strategized about taking the case to trial, and Klaus spoke to the DA about setting a trial date and ordering new evaluations. (DK 79:1-20, 169:1-170:12.) The new evaluations were completed at the end of 2018, and both evaluators found Plaintiff still met the criterial for a sexually violent predator.  (DK 79:7-11, Klaus Dec., Ex.15.)

**D.    Defendants Had No Opportunity to Fully and Fairly Litigate the Instant Claims**

In September 2018, the Court of Appeal decided *People v. Superior Ct.* (*Vasquez*), which held that a delay in trial of a sexually violent predator who had asked for a trial, could be attributable to the state, where "dramatic budget cuts" and 50% staffing reductions in the public defender's office demonstrated a "systemic breakdown in public defender system." (27 Cal. App. 5th 36, 59 (2018).) Woods discussed the case with his staff, and, in response to *Vasquez*, the SVP attorneys examined their cases to determine whether any client could potentially make a *Vasquez* type-claim. The ACPD then declared a conflict in any case there was *an appearance* of such a claim. (DK 112:16-113:22, 121:17-24, 143:15-144:1; BW 121:3-15, 123:1-19, 194:10-18; YE 86:7-87:1, 87:12-88:13.) Certain cases did not involve *Vasquez* issues because clients agreed to waive trial for strategic purposes where additional time could be used to the client's advantage. (BW 123:1-124:7.)  However, if, as in Plaintiff's case, a client had written a letter at **any** time in which they requested a trial, the ACPD declared a conflict so their client would have the ability to make all possible arguments, *even* if the ACPD did not believe the client's attorneys had done anything wrong in their defense of the case. (DK 115:10-116:8; 144:21-145:25) The ACPD believes it is the client's right to have separate counsel and that it is not up to the ACPD to decide if the *Vasquez* claim is valid. (DK 116:18-118:4; 145:20-25) Declaring a conflict in Plaintiff's case allowed him to take advantage of *Vasquez* and have "the full panoply of arguments" available to him to obtain his release. (DK 96:11-24; 118:10-119:3; 100:17-102:8; 104:6-13.)

A Marsden hearing was held in Plaintiff's case and Klaus elucidated the court on the conflict and *Vasquez* issue. (DK 102:10-20.) The court denied the Marsden motion, finding that none of the motions filed in Plaintiff's case were frivolous and that the ACPD had provided competent representation.  (RT, December 3, 2018, 13:7-28.) When the court attempted to set the case for trial, Plaintiff stated he did <u>not</u> want the case set for trial and instead wanted to appeal the Marsden ruling. (*Id.*, 14:1-5.)

Only Mike McCormick was called to testify in Plaintiff's *Vasquez* hearing, and while McCormick

14

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUGMENT
*Butler v. Woods, et al.*, U.S.D.C. Northern District of California Case No. 3:21-cv-00867-VC

reviewed the boxes containing Plaintiff's files prior to the hearing, it was only after the hearing and much later that he reviewed the files more carefully. (MM 113:13-114:8, 157:4-19.) McCormick did not speak to the DA about the content of his testimony in advance of the hearing. (*Id.*) Despite the allegations Plaintiff made against McCormick in the habeas petition, McCormick still felt a duty of loyalty to his former client and did not want to ruin Plaintiff's chances of being released. (MM 185:22-186:9, 191:7-18, 200:19-201:6.) Plaintiff's conflict counsel did not ask McCormick to testify because McCormick's testimony would be damaging to Plaintiff. (MM 205:6-17, 213:7-215:14, 217:13-19; 210:20-211:7.) Plaintiff won his *Vasquez* motion because the ACPD was extremely careful and circumspect in providing testimony and did not volunteer information that would destroy Plaintiff's chances of being released. As Klaus testified, "We did not want to help the prosecutor's office, we did not want to help their case. **We wanted to help Mr. Butler.**" (DK 120:6-121:3.)

Taylor was not aware of the habeas proceeding until he heard Plaintiff had sued the County. (Taylor Dec. ¶3.) Elenteny was not called as a witness in the habeas proceeding and was unaware of the Court of Appeal decision until after it was issued. (Elenteny Dec. ¶2.) Bellas did not become aware of Plaintiff's habeas proceeding *until she was sued in the instant action.* (Bellas Dec. ¶2.) Defendants here did not have separate counsel, nor were they parties to the habeas proceeding, and their civil interests were not represented by the DA, who was defending the validity of Plaintiff's SVP Petition in direct conflict with the objectives of the ACPD attorneys. They did not have the opportunity to present evidence or arguments on Plaintiff's Section 1983 claims. Although the DA is a County officer appointed by the Board of Supervisors and the County sets the DA's salary, the DA is a state official in its prosecutorial role with oversight from the attorney general. (Gov. Code §12550.) The County has no authority to affect the DA's independent judgment in its prosecutorial function. (Gov. Code §25303.) As prosecutor, the DA acts by the authority and <u>in the name of the people of the state</u>. (Gov. Code §26500.) The DA thus represents the state, not the county, when prosecuting crimes.

### III.     LEGAL ARGUMENT

#### A.     <u>Plaintiff's First Claim For Deliberate Indifference Against Woods and Bellas Is Meritless</u>

"In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior

liability under section 1983." (*Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).) "[S]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." (*Hillblom v. Cnty. of Fresno,* 539 F.Supp.2d 1192, 1206 (E.D. Cal. 2008); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).) The plaintiff must show that the defendant's unconstitutional conduct was the actual and proximate cause of his injuries. (*White v. Roper*, 901 F.2d 1501, 1501-1506 (9th Cir. 1990).) Vicarious liability is inapplicable in §1983 actions, and plaintiff must show that each defendant, through their own individual actions, violated the constitution. "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation." (*Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).)

A supervisor "can be found liable in his individual capacity if there is a sufficient nexus between his own conduct and the constitutional violations committed by subordinates." (*Johnson v. City of Vallejo*, 99 F.Supp.3d 1212, 1219 (E.D. Cal. 2015); *Preschooler II v. Clark County Sch. Bd. Of Trs.,* 479 F.3d 1175, 1183 (9th Cir. 2007).) Supervisory liability attaches "only if there exists either '(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" (*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)*; Jeffers,* 267 F.3d 895 at 915.) A supervisor is liable for constitutional violations of subordinates only if they participated in or directed the violations, or knew of the violations and failed to act to prevent them. (*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Johnson*, 99 F.Supp.3d at 1219.) "A supervisor can be liable … for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." (*Starr,* 652 F.3d at 1208.)

The undisputed evidence in this case shows that Woods and Bellas did not personally handle Plaintiff's case or participate in his defense. The actions taken in Plaintiff's defense were based upon his attorneys' professional judgment based on the particular circumstances of his case and their interpretation of the applicable law at the time, not on any administrative policy or directive by Bellas or Woods. The evidence also fails to show that Bellas or Woods knew or should have known of any constitutional violation by their subordinates and failed to stop them, particularly given that no constitutional violation

occurred and the state of the law applicable to SVP detainees was constantly evolving and did not suggest that any constitutional violation might result from Plaintiff's attorneys' strategic decisions based on their professional judgment and the unique facts of his case.

Further, the undisputed evidence also shows that Plaintiff's supervisory claims for inadequate training are meritless. Where a plaintiff claims supervisory liability for lack of training, the requisite state of mind is "deliberate indifference" to the rights of citizens whom the untrained employee is likely to encounter. (*City of Canton*, 489 U.S. 378, 389 (1989).) Deliberate indifference can be shown where a supervisor knowingly refuses to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury. (*Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959, 968 (9th Cir.2001).) Deliberate indifference is a high legal standard. Negligence is not enough to establish deliberate indifference. (*Marietta v. LoBue,* 851 F. App'x 108, 109 (9th Cir. 2021).) A plaintiff must show that the supervisory employee "disregarded the known or obvious consequence that a particular omission in their training program would cause … employees to violate citizens' constitutional rights." (*Flores v. Cnty. of Los Angeles,* 758 F.3d 1154, 1159 (9th Cir. 2014).) Plaintiff has no evidence that any training related to his attorneys' representation of SVP clients was inadequate. Only the most experienced attorneys were assigned to the SVP unit, and those attorneys had decades of experience and training. Plaintiff cannot point to any training deficiency, or any particular aspect of SVP representation that required more or different training as to how extremely experienced attorneys should handle management and strategic decision-making in SVP cases that was different from any other area of criminal law and their decades-long practices. SVP law and issues were constantly evolving and Plaintiff's attorneys testified that they kept abreast of any changes, re-evaluated their cases and modified their defense strategies accordingly. Plaintiff cannot identify any more or different training he claims should have been provided or how the lack of such unspecified alternate training proximately caused a violation of his rights. Plaintiff has no evidence to show that any training deficiency existed or that Bellas or Woods disregarded known or obvious consequences of any training deficiency. Plaintiff's §1983 claim for deliberate indifference against Bellas and Woods is unsupportable.

**B.      The Claims Against Bellas and Woods Are Barred By the Doctrine of Qualified Immunity**

Qualified immunity protects officials from liability where their conduct does not violate clearly

17

established law, **notwithstanding that reasonable officials could disagree.** (*Pearson v. Callahan,* 555 U.S. 223, 231 (2009).) A court discerns whether "the [official] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable interpretation of the events can be constructed…after the fact." (*Hunter v. Bryant,* 502 U.S. 224, 228 (1991).) Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. … because 'officials should not err always on the side of caution' because they fear being sued." (*Id.* at 229; *Brosseau v. Haugen,* 543 U.S. 194, 205 (2004).)

To defeat qualified immunity, the law must be "'clearly established in light of the specific context of the case' at the time of the events in question." (*Mattos*, 661 F.3d at 440.) It is <u>Plaintiff's burden</u> to show the law was clearly established so "<u>every</u> reasonable official would [have understood] that what he is doing violates that right." (*Reichle v. Howards*, 566 U.S. 658, 664 (2012), emphasis added.) "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (*Id.* at 664.) Whether the law was clearly established "must be [determined] in light of the specific context of the case, not as a broad general proposition." (*Katz,* 533 U.S. at 205, overruled in part re mandatory analysis procedure; *Pearson,* 555 U.S. at 232.) "[It must] be clear to a reasonable [official] that his conduct was unlawful <u>in the situation he confronted.</u>" (*Katz,* at 202, emphasis added; *Brosseau,* 543 U.S. at 205.) A clearly established legal principle must have a sufficiently clear foundation in then-existing precedent," as shown in "controlling authority or a robust consensus of cases of persuasive authority." (*Tuuamalemalo v. Greene,* 946 F.3d 471, 477 (9th Cir. 2019).) "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." (*D.C. v. Wesby,* 138 S. Ct. 577, 590 (2018).) The right at issue must be defined with "specificity" and "not ... at a high level of generality." (*Gordon v. Cty. of Orange,* 6 F.4th 961, 968 (9th Cir. 2021); *Wilson v. Layne,* 526 U.S. 603 (1999).)

The SVPA sets no deadline for a trial on an SVP petition and the SVPA is a civil commitment proceeding, not a criminal prosecution, thus the Sixth Amendment right to a speedy trial is inapplicable. Before *People v. Vasquez* was decided in 2018, the law was not defined with specificity regarding an SVP's due process right to a speedy trial claim. In 2008, the Court of Appeal in *People v. Litmon* applied the balancing tests articulated in *Barker v. Wingo* and *Mathews v. Eldridge* to a person alleged to be an

18

SVP, and concluded that  the government had a responsibility to bring a person to trial on an SVP petition "at a **'meaningful time'**…." (*Vasquez*, 27 Cal. App. 5th at 57.) *Litmon* did not clearly establish when an SVP trial had to take place. In fact, the Court specifically noted that it was an open question: "It is not entirely clear what analytical framework, *Mathews*, *Barker* or some amalgam, will ultimately be applied by the United States Supreme Court in evaluating a procedural due process claim of excessive pre-trial delay in the context of involuntary civil commitments." (*Litmon*, at 135.) This area of law remained unclear, as demonstrated by *People v. Landau*, 214 Cal.App.4th 1, 27 (2013), which acknowledged that neither the California Supreme Court nor the United States Supreme Court had decided what test applied in deciding a due process/timely trial claim in an SVP proceeding, and held that a seven-year delay did not violate Landau's due process rights because the "vast majority" of the delays were at Landau's request or with his consent. In 2018, *Vasquez* again changed the legal landscape regarding when an SVP trial had to occur and held that the right to a speedy trial applies to SVP proceedings. The length of the delay and the reasons for the delay led the *Vasquez* Court to find in favor of a speedy trial violation, even though Vasquez failed to object to multiple continuances and did not raise speedy trial right until 16 years after his SVPA petition was filed. Given the evolving state of the law and the lack of any clear right to a speedy trial in SVP commitment proceedings until *Vasquez*, the law regarding the timeframe in which an SVP detainee is to be brought to trial was *not* clearly established,  particularly where most detainees seek to delay trial to gain release through legal challenges.

Notably, Bellas and Woods did not represent Plaintiff, and their obligation in their supervisory capacity under the SVPA was even more uncertain and unresolved. Defendants are not obligated to show any authority that permitted their actions, but rather, it is Plaintiff's burden to show their specific acts were clearly prohibited under factually similar authority. Plaintiff cannot meet his burden to identify any clearly established, relevant authority that clearly prohibited Bellas or Woods from entrusting their highly experienced, senior attorneys to make strategic decisions in SVP cases as they did in all other types of defense cases, and no authority that clearly required them to micro-manage their SVP attorneys' professional decision-making and legal strategies. Bellas and Woods are entitled to qualified immunity.

**C.**   **Plaintiff Cannot Establish *Monell* Liability Under Any Theory**

Public entities are not vicariously liable under §1983 and only may be liable "where its policies are

the moving force behind the constitutional violation." (*Id.* at 389; *Connick v. Thompson,* 563 U.S. 51, 60 (2011).) "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." (*Bd. of the Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1996); *Plumeau v. Sch. Dist. #40 Cnty. of Yamhill,* 130 F.3d 432, 438 (9th Cir. 1997).)

### 1.    No Evidence Supports A Claim Based On A Pattern, Policy Or Custom

To show municipal liability based on a pattern, custom or practice, the critical issue is whether there was a particular custom or practice that was so widespread as to have the force of law. (*Brown,* 520 U.S. at 404.) For example, the Ninth Circuit has found that one or two incidents of excessive force are inadequate. (*See Davis v. Ellensburg,* 869 F.2d 1230, 1233-1234 (9th Cir. 1989) and *Meehan v. Los Angeles Cnty.*, 856 F.2d 102, 107 (9th Cir. 1988).) Indeed, even six occasions of alleged unlawful force within a year and 18 additional reports of similar misconduct have been found inadequate to establish a municipal policy. (*City & Cnty. of San Francisco,* No. C-05-234 VRW, 2006 WL 3507944 *1 at *10 (N.D. Cal. Dec. 1, 2006).) Moreover, "The custom or policy must be a 'deliberate choice to follow a course of action…made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" (*Castro v. Cnty. of L.A.,* 833 F.3d 1060 (9th Cir. 2016); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986).) Plaintiff cannot merely identify a custom or policy that caused his injury, but must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [parties]." (*Castro,* 833 F.3d at 1076; *Harris,* 489 U.S at 392.) Plaintiff here has no evidence to show that his constitutional rights were violated by an official municipal policy or widespread practice. Plaintiff cannot show a pattern of violations of SVP detainees' rights caused by the SVP attorneys' professional judgment and strategic decisions that Bellas and Woods deliberately ignored and consciously chose to continue to allow SVP attorneys to exercise their professional judgment in spite of such knowledge. Moreover, given that the SVP law was evolving, *Vasquez* did not exist until 2018, and its effect and application remained unclear, Plaintiff has no evidence to show that Bellas or Woods' micromanagement of SVP attorneys' strategic decisions would have resulted in a different defense strategies or tactics. Plaintiff thus cannot show that any County policy allowing SVP attorneys autonomy in exercising their professional judgment was the moving force behind a violation of his constitutional rights. (*Harris,* 489 U.S at 392.) Plaintiffs cannot meet the "rigorous standard" of culpability and causation to support a *Monell*

unconstitutional custom or policy claim. (*Brown,* 520 U.S. at 405.)

### 2.   Plaintiffs Have No Evidence to Support a Ratification Claim

To establish ratification, Plaintiff must prove that the County's authorized policymakers made a conscious, affirmative, deliberate choice to endorse a subordinate's decision and the basis for it. (*Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *Praprotnik,* 485 U.S. at 123-124; *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).) Mere refusal to overrule a subordinate's completed act does not constitute approval. (*Iopa,* at 1239-40; *Praprotnik,* at 128-130.) Plaintiff must show policymakers knew of unconstitutional conduct by subordinates before the constitutional violations ceased and approved or failed to stop such conduct. (*Id.*) Plaintiff has no evidence that Bellas or Woods knew of any unconstitutional conduct by Plaintiff's defense attorneys, or that they approved or failed to stop the conduct. The law was not clear that any defense strategies employed were unconstitutional, and there is no evidence that Bellas or Woods knew that any of Plaintiff's attorneys were implementing unconstitutional strategies yet approved their actions.

### 3.   Plaintiffs' Inadequate Training Claim Is Meritless

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." (*Connick,* 563 U.S. at 61.) Plaintiff must establish that the training program or supervision is inadequate due to policy makers' deliberate indifference to the rights of persons with whom the entity's employees may come in contact, and that inadequate training or supervision actually caused the deprivation of the constitutional right. (*City of Canton*, 489 U.S. at 389; *Dougherty v. City of Covina,* 654 F.3d 892, 900-01 (9th Cir. 2011).) Deliberate indifference is shown when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need." (*Id.* at 390; *Connick,* 563 U.S. at 62.) Permitting cases against entities "for their 'failure to train' employees to go forward…on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities–a result [the Court] rejected in *Monell*." (*City of Canton,* at 391-392.)

The training required for attorneys is vastly different than that of other public employees, because attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. Before they may enter the profession and become licensed, attorneys must graduate from law school and pass the bar exam. "These threshold requirements are designed to ensure that all new attorneys have learned how to find, understand, and

21

apply legal rules." (*Connick,* 563 U.S. at 64-66.) They also must meet character and fitness standards. Professional training continues throughout a legal career. Attorneys must satisfy continuing-education requirements and are personally subject to rules of professional responsibility designed to reinforce the profession's standards. Additionally, as in a public defender's office, attorneys who practice with other attorneys train on the job as they learn from more experienced attorneys. In light of this "regime of legal training and professional responsibility," the Supreme Court in *Connick* found that recurring constitutional violations were not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law. (*Id.)* Failure-to-train liability under Section 1983 is concerned with substance of training, not the particular instructional format; section 1983 does not provide plaintiffs or courts carte blanche to micromanage local governments.  (*Connick,* 563 U.S. 51.) Merely showing that additional training would have been helpful in making difficult decisions does not establish municipal liability. (*Connick v. Thompson*, 563 U.S. at 68.)

In this case, each of Plaintiff's attorneys had two or more decades of experience in criminal defense. They had handled felony jury trials to verdict, including death penalty and special circumstance cases. They, *themselves,* had supervised attorneys in units. Certain branches within the ACPD, such as Law and Motion and the SVP Unit do not require the type of supervision needed for other branches because only the most experienced attorneys are assigned to these units. The undisputed evidence shows that Plaintiff's attorneys received extensive training throughout their long careers, and they received SVP specific training when they entered the unit and continuing throughout their assignment. ACPD attorneys must undergo mandatory training and they are supervised as they progress through the ranks of the various public defender levels, from misdemeanors to felony trial staff. All ACPD attorneys receive ongoing training through <u>weekly</u> updates from the Law and Motion department about significant case law developments, including SVP issues. In addition, training materials and resources were provided to attorneys entering the SVP assignment by the attorneys within that Unit. SVP attorneys also attended legal training seminars on SVP defense administered by the California Public Defender's Association. Plaintiff cannot identify any deficiency in the substance of training SVP attorneys received, and he has no evidence to show that any lack of training caused the deprivation of SVP detainees' constitutional rights. There is no evidence to show that the need for more or different training was so obvious, yet

ignored by Bellas and Woods. Plaintiff's disagreement with the instructional format of the SVP training is inadequate to support a §1983 inadequate training claim. (*Connick,* 563 U.S. 51.)

Plaintiff also has no evidence to support any claim for municipal liability based on inadequate supervision. The attorneys in the SVP Unit knew their clients and their cases, they were fully aware of changes in the law in an evolving practice area, and they knew the tendencies of the judges hearing those cases and the DAs prosecuting those cases.  SVP attorneys had the greatest degree of expertise in the PD's office and served as a resource to others regarding SVP issues and practice.  The attorneys assigned to the SVP Unit had decades of experience in complicated criminal defense practice and had reached a level in the PD's office and in their work that allowed Bellas and Woods to trust their professional judgment. Any micromanagement of these attorneys individually or their cases was unwarranted and improper. Plaintiff also cannot show requisite causation as he has no evidence to show that more or different training or supervision would have prevented the alleged violation of constitutional rights given the training and supervision that was provided and the constantly evolving SVP law.

### D.   Offensive Collateral Estoppel Does Not Apply to the Habeas Petition

Plaintiff's collateral estoppel argument ignores the distinction between offensive and defensive collateral estoppel. Defensive use of collateral estoppel prevents a plaintiff from asserting a claim that the <u>plaintiff</u> had previously litigated and lost against another defendant.  (*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, (1979).) Offensive collateral estoppel, on the other hand, is asserted by a plaintiff in a suit to prevent <u>the defendant</u> from relitigating an issue previously decided against the defendant. While trial courts have discretion to determine when to apply offensive collateral estoppel, offensive estoppel should not be applied where it would be unfair to a defendant. (*Syverson v. Int'l Bus. Machines,* 472 F.3d 1072, 1078 (9th Cir. 2007); *Appling v. State Farm*, 340 F.3d 768, 776 (9th Cir. 2003).)

Offensive collateral estoppel is appropriate if (1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action. (*Syverson,* 472 F.3d at 1078.) Even where the elements of collateral estoppel are met, offensive collateral estoppel should not be applied if application of the doctrine would be unfair," for example, where procedural opportunities were unavailable in the first action that might be

likely to cause a different result. The primary consideration in applying offensive collateral estoppel is the defendant "**received a 'full and fair' opportunity to litigate their claims" in the first proceeding**. (*Parklane,* at 332; *In re Citric Acid Antitrust Litig.*, 1996 WL 116827, at *1 (N.D. Cal. 1996).)

Here, the Defendants clearly did not have a full or fair opportunity – let alone any opportunity – to defend themselves in the habeas proceeding. Neither Bellas nor Woods had standing to litigate any issues in the habeas proceeding, nor were they parties to the habeas proceeding. They had no standing to appeal the decision. None of the Defendants in this action had the right to control the habeas litigation or conduct discovery. To the contrary, Diane Bellas was not even *aware* of the habeas proceeding until she was sued two years after the habeas ruling. Only one public defender was called to testify, and he felt constrained by his duty of loyalty to his former client. He did not want to volunteer information, if not asked, that would ruin Plaintiff's chances of release. None of the other public defenders were called to testify, and Taylor was not aware of the habeas proceeding until after he heard of the civil suit. Moreover, the ACPD wanted to help Plaintiff, not the DA. As such, the ACPD did not try to inject itself into the proceedings to proffer evidence that would establish Plaintiff consented to the delay. For this reason, the habeas order, and subsequent Court of Appeal decision, were based upon an incomplete and distorted evidentiary record.  The totality of evidence before *this* Court, in *this* case, was not before the habeas court, which is why Plaintiff succeeded in his habeas petition. Defendants did not, by any stretch of the imagination, have a full and fair opportunity to defend themselves in the habeas proceeding.

Second, the issue in the habeas proceeding was not identical to the issues in the Section 1983 action, and the Section 1983 claim was not actually litigated in the habeas proceeding.  The habeas court did not consider whether Bellas, Woods, or the County were deliberately indifferent to Plaintiff's constitutional rights, as that issue was not part of the analysis regarding who was responsible for the trial delay. Third, there is no privity between the Defendants in this action and the respondent District Attorney in the habeas proceeding. As the respondent in the habeas petition, the District Attorney was not acting on behalf of, nor as an agent of the County. In its prosecutorial role in SVP proceedings, the District Attorney acts on behalf of the State, not the County. (Gov. Code §§ 25303, 26500.) Moreover, the District Attorney's interest is adverse to the Public Defender's in the defense of SVP clients, and the County has no oversight or control over the how the District prosecutes SVP cases. (*Weiner v. San Diego*

24

*County*, 210 F.3d 1025 (2000).) Plaintiff cites no legal authority to support his contention that "courts have held that the agents of the same government are in privity with each other." To the contrary, the authorities cited above demonstrate that the DA and ACPD are not in privity with each other.

Plaintiff's reliance on *Birch v. Gonzalez*, is entirely misplaced as that case involved defensive collateral estoppel, and the defendants sought to use defensive collateral estoppel to bar the plaintiff from relitigating an issue he had already litigated and lost in the habeas decision. (2013 WL 1191429, at *8-9.) In fact, courts have held offensive collateral estoppel does not apply in cases similar to this one. (See, *Hays v. Clark County Nevada*, 2008 WL 2372295, *11 (D. Nev. 2008) (finding that offensive collateral estoppel would be unfair where public defenders and county were not parties to a habeas proceeding that found plaintiff's due process rights had been violated by the prosecutor and his own attorneys); *Wiley v. Pliler*, 2007 WL 2344888 (E.D.Cal 2007) (offensive collateral estoppel did not apply to habeas decision where defendant did not have a full and fair opportunity to litigate the issues in the state habeas action.) Plaintiff's motion should therefore be denied and Defendants should be given the ability to litigate in this action the threshold issue of whether Plaintiff's due process right to a timely trial was denied.

**E.**   **Plaintiff's Claims Are Untimely And Barred By The Statute Of Limitations**

Section 1983 does not contain a specific statute of limitations, thus federal courts apply the forum state's statute of limitations for personal injury actions. (*Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004); *Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004); Cal. Civ. P. Code § 335.1.) Federal courts also apply the forum state's laws with respect to tolling of the statute of limitations. (*Jones*, 393 F.3d at 297.) A Section 1983 action accrues and begins to run when <u>plaintiff knows or has reason to know of the injury that is the basis of the action.</u> (*Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Belanus v. Clark*, 796 F.3d 1021, 1025 (9th Cir. 2015). ) In March 2009, Plaintiff sent a letter to his public defender, Mike McCormick, stating that he was "requesting to be taken to trial as soon as possible…and ***my due process has been violated***." Plaintiff's claims thus accrued at the latest in 2009, when he complained his due process rights were violated by not receiving a trial. The Complaint, however, was not filed until February 3, 2021. Accordingly, any claims based on acts that occurred more than two years before the date his Complaint was filed, i.e., prior to <u>February 3, 2019</u>, are time-barred, and no equitable tolling applies. (Butler Dep. Vol 1, 84:10-19, 85:5-19, 88:11-22, 91:11-92:15; Vol 2, 387:4-389:25.)

25

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUGMENT
*Butler v. Woods, et al.*, U.S.D.C. Northern District of California Case No. 3:21-cv-00867-VC

1

## IV.   CONCLUSION

2    For the reasons set forth above and in the supporting papers filed concurrently herewith,

3    Defendants respectfully submit that the instant motion for summary judgment or partial summary

4    judgment should be granted, and Plaintiff's motion for partial summary judgment should be denied.

5    Dated:  August 18, 2022                    BERTRAND, FOX, ELLIOT, OSMAN & WENZEL

6

7                                              By:  ____/s/ Ilana Kohn_____

8                                                   Michael C. Wenzel
                                                    Ilana Kohn
9                                                   Kara Goidosik
                                                    Attorneys for Defendants
10                                                  BRENDON D. WOODS, DIANE BELLAS, LAW
                                                    OFFICES OF THE ALAMEDA COUNTY PUBLIC
11                                                  DEFENDER, COUNTY OF ALAMEDA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUGMENT
*Butler v. Woods, et al.,* U.S.D.C. Northern District of California Case No. 3:21-cv-00867-VC